UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
NAVDEEP SINGH,

                        Petitioner,                             REPORT AND
                                                      RECOMMENDATION

       -against-

                                                     09 CV 138 (DLI)(RML)

WILLIAM CONNOLLY, Superintendent,

                        Respondent.
-------------------------------------------------------X

LEVY, United States Magistrate Judge:

          Petitioner Navdeep Singh ("petitioner" or "Singh") filed this *pro se* habeas corpus

petition pursuant to 28 U.S.C. § 2254 on January 7, 2009. By order dated June 22, 2010, the

Honorable Dora L. Irizarry, United States District Judge, referred the matter to me for a Report

and Recommendation. Petitioner subsequently filed a supplemental submission on July 29,

2010. For the reasons stated below, I respectfully recommend that the petition be denied.

**BACKGROUND AND FACTS**

          This case arose out of events that transpired at Carribean Tropics, a nightclub in

Jamaica, Queens ("the nightclub"), on July 14, 2001. At approximately 3:00 a.m. on that date,

police officers Ray Durrell and Arthur Liebman responded to a radio call and drove to the

nightclub. (Transcript of Trial, dated Jan. 21–30, 2002 ("Tr."), at 52.) When they arrived

outside of the nightclub, they observed Anant Patel ("Patel") leaning against the outside wall and

"bleeding pretty badly" from his chest. (Id. at 53–54.) Patel told Officer Durrell that he had been

stabbed by "an Indian male with a beard and blue turban," and he pointed westbound towards

Jamaica Avenue. (Id. at 54.) After speaking to a few people at the scene (id. at 55), the officers

proceeded westbound on Jamaica Avenue. (Id. at 56.) They found petitioner and another

individual, Puneet Singh ("Puneet"),[1] at a bar-restaurant about three blocks away from the nightclub and arrested them.  (Id. at 57–59.)  Following the arrest, Officer Durrell searched petitioner and found a silver knife in a silver-colored case, with "blood dripping out of it."  (Id. at 59.)  When the officers questioned him, petitioner admitted that he had stabbed Patel but stated that he did so because he was in fear of his life.  (Id. at 60.)

Queens County Indictment 2203/01 charged petitioner[2] with Attempted Murder in the Second Degree (New York Penal Law § 110/125.25[1]), two counts of Assault in the First Degree (New York Penal Law § 120.10[1]), one count of Criminal Possession of a Weapon in the Fourth Degree (New York Penal Law § 265.01[2]), and one count of Assault in the Third Degree (New York Penal Law § 120.00[1]).[3]  (Affidavit of Unsher Padit, Esq., dated June 30, 2009 ("Padit Aff."), ¶ 7.)

On January 21, 2001, petitioner's trial commenced.  Officer Durrell recounted his arrival at the club and discovery of the injured Patel, his subsequent arrest and search of petitioner, and petitioner's admission and claim of self-defense.  (See Tr. at 53–60.)  He also testified that he did not see any cuts, abrasions, scratches, or injuries on petitioner on the night in question.  (Id. at 73.)  The prosecution also offered the testimony of Dr. Jeffrey Cane, a cardiothoracic surgeon, who treated Patel at Mary Immaculate Hospital on the morning of the

---

[1] Petitioner and Puneet are not related.  (Affidavit of Unsher Padit, Esq., dated June 30, 2009, ¶ 3 n.1.)

[2] A grand jury failed to indict Puneet on charges relating to the same incident.

[3]  The third-degree assault charge corresponded to the alleged attack of petitioner on Blesson Mathews, as discussed below, rather than the incident involving Patel.

incident and described Patel's injuries as "clearly life-threatening."[4]  (Id. at 253.)

Patel testified for the prosecution and stated under oath that, at about 2:30 a.m. on the night in question, as he was trying to reach the sink in the nightclub's bathroom, he was approached by petitioner and Puneet.  (Id. at 269.)  According to Patel, Puneet repeatedly asked him, "do you remember me?," ignored Patel's claims that he did not know what he was talking about, then proceeded to shove him repeatedly.  (Id. at 271, 272–73.)  Patel stated that eventually he took a swing back at Puneet, and then petitioner hit him in the chest.  (Id. at 274.)  According to Patel, it was only after he followed both petitioner and Puneet out of the bathroom that he discovered that he had been stabbed in the chest.  (Id. at 278.)

Blesson Mathews, Nishit Philip, Joel George, and Mohammed Mohyuddin all testified for the prosecution about the events leading up to and following the incident in the bathroom.  Both George and Philip testified that they witnessed the beginning of the confrontation between petitioner, Puneet, and Patel, and claimed that the fight was only between those three men.[5]  Mathews and Mohyuddin both explained that they were outside of the club at

---

[4] According to Dr. Cane, Patel's injuries, which required surgery, included a wound over "a centimeter and a half" wide (Tr. at 245), and internal injuries to the diaphragm and liver (id. at 247).  He also testified that Patel had lost about a quart of blood by the time of surgery, and that Patel was hospitalized for about two weeks following surgery.  (Id. at 246, 254.)

[5] George stated that when he entered the bathroom, Patel, petitioner, and Puneet were all near the sink.  (Tr. at 588–89.)  According to George, after he used the urinal, he heard voices raised and, fearing that there might be a problem, left to summon bouncers.  (Id. at 590.)  Philip testified that he was in the bathroom using a urinal at the time of the incident and that, after hearing sounds of an argument, he turned and witnessed Puneet take "a swing" at Patel and Patel take a swing back.  (Id. at 452–53.)  Next, according to Philip, Singh reached for something tucked under his belt and quickly "jabbed" Patel in the chest.  (Id. at 453.)  Philip explained that after petitioner hit Patel, he and Puneet, followed by Patel, ran out of the bathroom.  (Id. at 454.)  According to George, a group of ten to fifteen "guys," including Mathews and Mohyuddin, then
(continued...)

-3-

the time of the incident and saw petitioner, Puneet, and Patel run out of the club. (Id. at 386–87, 686.) Mathews also stated that after a distraught Patel lifted up his bloody shirt and identified petitioner and Puneet as his assailants, Mathews approached the two men. (Id. at 387–88.) Then, according to Mathews and Mohyuddin, petitioner punched Mathews on the upper left arm. (Id. at 391, 691.)

Defense counsel cross-examined each of the prosecution witnesses at length. For example, they elicited that some of Patel's testimony derived from conversations he had had with other witnesses rather than from his own personal knowledge. (See id. at 297–301.) They also questioned those witnesses with criminal records about their convictions. In addition, defense counsel asked Mathews, Philip, and George whether they had heard of a group called "The Horsemen." Each replied that he had and that it was a "basketball team."[6]

Petitioner testified on his own behalf and raised a justification defense, arguing that he was acting in self-defense when he hurt both Patel and Mathews. He first explained that he is a practicing Sikh and that, as a result, he is required to carry a Kirpaan, which is a knife that can be used for self-defense. (Id. at 871–72.) He then detailed his version of the events of July 14, 2001. According to petitioner, when he and Puneet were washing their hands in the nightclub's bathroom, over ten men, on whose breath he could smell alcohol, entered the room.

---

[5](...continued)
surrounded petitioner and Puneet. (Id. at 593.) George testified that he soon joined this group (id. at 594), which followed the two men as they ran westbound on Jamaica Avenue. (Id. at 597.)

[6] Mathews stated that he was not a member of the group but had heard of it and that it was a basketball team. (Tr. at 401, 403.) When asked if it was a "well-known gang," he responded "no." (Id. at 404.) Philip testified that he was a member of the Horsemen, but that it was a basketball team and that its members met in social clubs. (Id. at 524.) George stated that he did not belong to the group but agreed that it was a street basketball team. (Id. at 647.)

(Id. at 876–77.)  Petitioner stated that Patel was among them and that he confronted petitioner

and Puneet and claimed to know them.[7]  He testified that Patel refused to believe the two men

when they said they had never met him, and Patel told them that "[y]ou guys are getting fucked

up tonight.  You guys are not walking out of here alive." (Id. at 877–78.)  Next, according to

petitioner, Patel and his friends starting throwing punches, and a fight between petitioner, Puneet,

and Patel and his friends ensued.  (Id. at 878.)  Petitioner testified that he grabbed his Kirpaan

and held it up in an attempt to try to scare the men away.  (Id. at 879.)  However, according to

petitioner, Patel charged at him and plunged into the knife.  (Id. at 878.)  Still afraid for his life,

petitioner fled the bathroom and eventually the club.[8]  (Id. at 882.)  To corroborate his

justification claim, petitioner presented four other witnesses.  Irwin Blye testified about the

layout of the nightclub and bathroom, Ajit Singh and Juan De Lo Santo testified that they had

seen a large group of men chasing petitioner, and Dr. Morris Zedeck testified about the blood

alcohol levels of Patel and Matthews.[9]

----

[7] Petitioner claimed that Patel first approached them saying, "What's up turban heads.  Do you remember me?"  (Tr. at 876.)  According to petitioner, after he and Puneet both stated that they did not know Patel, Patel insisted that they were the ones "that said you were going to fuck up my friend." (Id. at 877.)

[8] According to petitioner, a group of about fifty people, carrying bats, bottles, and sticks, encircled him and Puneet outside of the club, kept saying "Horsemen," and threatened them.  (Tr. at 882, 885.)  He testified that at one point while he was surrounded, Mathews, who was holding a bottle, lunged at him, and petitioner cut him in the shoulder.  (Id. at 882.)

[9] Ajit Singh testified that he was working an overnight shift at the Atlas Gas station on 184th Street in Jamaica, Queens, and that he saw two Sikh men running away from twenty men, who were holding "stakes" and throwing bottles.  (Tr. at 806–07.)  De Lo Santo, the owner of the El Salto restaurant on Jamaica Avenue in Queens, testified that two men came running into the restaurant at about 3:00 a.m. and asked him to call the police.  (Id. at 857.)  De Lo Santo also stated that he saw a group of more than twenty people carrying stones, bats, or tubes outside his

(continued...)

On January 30, 2001, the jury acquitted petitioner of the second-degree attempted murder count, the third-degree assault count, and one of the first-degree assault counts, but found him guilty of first-degree assault (with intent to cause serious physical injury) and fourth-degree criminal possession of a weapon. (Id. at 1180.) On September 15, 2003, petitioner was sentenced to a five-year term of imprisonment on the assault conviction, a one year-term on the criminal possession of a weapon conviction, to be served concurrently, and five years of post-release supervision. (Pandit Aff. ¶ 9.) Petitioner is no longer in custody but he remains on supervised release. (Notice of Change of Address, dated Apr. 8, 2009 (Dkt. Entry #10).)[10]

B. Procedural History

On March 5, 2004, petitioner, represented by counsel, filed a brief in the Appellate Division, Second Department, in which he argued that his conviction should be reversed because the State's evidence was insufficient to prove his guilt beyond a reasonable doubt and the verdict was against the weight of the evidence. (Pandit Aff. ¶ 10.) Specifically, he argued that the prosecution's key witnesses were "incredible as a matter of law" and the prosecution failed to disprove his justification defense. (Brief for Defendant-Appellant, dated Mar. 5, 2004, at 22.) On November 29, 2004, the Appellate Division affirmed petitioner's

---

[9](...continued)
restaurant. (Id.) Dr. Zedeck testified as an expert in pharmacology and toxicology and explained that he had reviewed Patel's and Mathews's hospital records, and that their blood alcohol levels were .146 and .095, respectively. (Id. at 999, 1005.)

[10] Because petitioner remains on supervised release, the jurisdictional "in custody" requirement of 28 U.S.C. § 2255 is satisfied. See Scanio v. United States, 37 F.3d 858, 860 (2d Cir. 1994) (finding that a petitioner may be considered "in custody" for habeas corpus purposes while he or she is still under supervised release).

judgment of conviction and held that the evidence was legally sufficient to establish petitioner's guilt beyond a reasonable doubt and that the guilty verdict was not against the weight of the evidence. People v. Singh, 785 N.Y.S.2d 466 (2d Dep't 2004). The court found "no basis to disturb the jury's resolution of the credibility issue and its rejection of the justification defense" and noted that the evidence against petitioner "included testimony that the defendant drew a knife and stabbed the unarmed victim in the chest." Id. at 467. The Court of Appeals denied leave to appeal. People v. Singh, 825 N.E.2d 143 (N.Y. 2005).

On November 14, 2005, petitioner moved before the trial court to vacate his judgment of conviction pursuant to N.Y. Crim. Proc. Law § 440.10. (Pandit Aff. ¶ 15.) He claimed that he had received ineffective assistance of trial counsel. (Id.) Specifically, petitioner argued that his trial counsel were ineffective in failing to call (a) fact witnesses, including Puneet, (b) an expert witness to testify about the Sikh religion, and (c) a character witness. (See Memorandum of Law in Support of Motion to Vacate, dated Nov. 14, 2005; Pandit Aff. ¶ 15.) On March 15, 2006, the court denied petitioner's motion, finding that petitioner's claim was without merit because trial counsel had, along with an investigator, interviewed many potential defense witnesses, had presented four such witnesses, and "clearly [had] made strategic decisions regarding defendant's case." (Decision and Order, dated Mar. 23, 2006, at 4.) The court also found that petitioner had failed to demonstrate any prejudice. (Id.) On April 20, 2006, petitioner requested leave to appeal the trial court's denial of his motion to vacate. (Pandit Aff. ¶ 18.) On August 24, 2006, the Appellate Division denied petitioner's leave application. (Decision and Order, dated Aug. 24, 2006.)

On September 8, 2006, petitioner moved before the trial court to vacate his

judgment of conviction pursuant to N.Y. Crim. Proc. Law § 440.10. (Pandit Aff. ¶ 20.) He argued that his conviction should be vacated because of newly discovered evidence, namely email correspondence and pictures from a website that allegedly showed that several prosecution witnesses had perjured themselves when they testified at trial that the "Horsemen" was a basketball team rather than a gang. (Id. ¶¶ 20–21.) On March 15, 2007, the court denied petitioner's motion and held that "the new items merely impeach the former evidence, defendant fails to establish that such evidence could not have been discovered prior to trial and finally, such evidence would not have changed the outcome of the trial." (Decision and Order, dated Mar. 15, 2007, at 5.) The Appellate Division denied petitioner's request for leave to appeal the trial court's decision on June 4, 2007. (Decision and Order, dated June 4, 2007.) On June 29, 2007, petitioner moved for reconsideration of the Appellate Division's June 4, 2007 denial of his application for leave to appeal. On September 17, 2007, the Appellate Division denied petitioner's motion to reargue. (Decision and Order, dated Sept. 17, 2007.)

On February 1, 2008, petitioner moved before the Appellate Division, Second Department, for a writ of error *coram nobis* on the grounds that he received ineffective assistance of appellate counsel. (Pandit Aff. ¶ 27.) He argued that his appellate counsel was ineffective in failing to argue that: (1) the trial court erroneously permitted prejudicial photographs of the victim into evidence; (2) there was prosecutorial misconduct; (3) trial counsel failed to prevent the introduction of petitioner's pre-Miranda inculpatory statements into evidence; (4) the court's instructions to the jury that witnesses were not prohibited from speaking to one another was erroneous; and (5) the court erroneously permitted inadmissible evidence and an in-court identification of petitioner into evidence at trial. (Id.) On September

9, 2008, the Appellate Division denied petitioner's application and held that petitioner "failed to establish that he was denied the effective assistance of appellate counsel." People v. Singh, 863 N.Y.S.2d 371, 371 (2d Dep't 2008). On February 19, 2009, the Court of Appeals denied petitioner leave to appeal the trial court's denial. People v. Singh, 904 N.E.2d 851 (N.Y. 2009).

DISCUSSION

Petitioner filed the instant habeas corpus petition on January 7, 2009. In his petition, he raises four grounds for relief. He contends that: (1) the evidence presented at trial was insufficient to prove his guilt beyond a reasonable doubt, (2) the trial court wrongly decided his motion to vacate on the grounds of newly discovered evidence,[11] (3) trial counsel was ineffective, and (4) appellate counsel was ineffective.

A. Statute of Limitations

The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") requires a petitioner to file his or her petition in federal court within one year of "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review . . . ." 28 U.S.C. § 2244(d)(1)(A). Direct review refers to review by both the state courts and the United States Supreme Court, so a conviction becomes final for AEDPA purposes when the time to seek direct review in the United States Supreme Court by writ of certiorari expires—ninety (90) days after entry of the judgment of conviction or of the

---

[11] In his reply brief, plaintiff transforms his newly-discovered-evidence claim into a wholly distinct claim—that his due process rights were violated by the prosecutor's knowing use of perjured testimony. As explained further below, to the extent that this is petitioner's claim, it is unexhausted and procedurally barred because he did not raise it on direct appeal.

order denying discretionary review. See Williams v. Artuz, 237 F.3d 147, 151 (2d Cir. 2001).

Petitioner appealed his judgment of conviction to the Appellate Division, which denied his claims on November 29, 2004. The New York Court of Appeals then denied leave to appeal on January 25, 2005. Thus, his judgment then became "final" ninety days later, on April 25, 2005. Although petitioner did not file his petition for a writ of habeas corpus for well over a year after his conviction became final, the limitations period was tolled while his post-conviction motions were pending for review in state court. 28 U.S.C. § 2244(d)(2) (the "time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted"). The term "pending" in the statute has been construed broadly to encompass all the time during which a state prisoner attempts, through proper use of state procedures, to exhaust state court remedies with regard to a particular post-conviction application. See generally Carey v. Saffold, 536 U.S. 214 (2002) (holding that the term "pending" includes the intervals between a lower court decision and a filing in a higher court on motions for collateral review).

From April 25, 2005, the date the judgment became final, until November 14, 2005, when petitioner filed his first § 440.10 motion to vacate the conviction in the New York Supreme Court, 203 days passed. While his § 440.10 motion was pending, the statute of limitations was tolled. The statute of limitations continued to be tolled until the Appellate Division denied petitioner's application for leave to appeal on August 24, 2006. Fifteen days passed from that date until September 8, 2006, when petitioner filed his second § 440.10 motion to vacate. The statute of limitations on his habeas petition was tolled from the filing of that motion until September 17, 2007, when the Appellate Division denied his motion to

reargue his application for leave to appeal the trial court's denial of the motion.  One hundred

thirty-seven days passed from that date until February 1, 2008, when petitioner moved before

the Appellate Division for a writ of error *coram nobis* on the grounds that he received

ineffective assistance of appellate counsel.  The statute of limitations was tolled during the

pendency of his application and his appeals; on February 19, 2009, the Court of Appeals denied

petitioner leave to appeal the trial court's denial, People v. Singh, 904 N.E.2d 851 (N.Y. 2009).

Petitioner filed his habeas corpus petition on January 7, 2009.  By this court's calculation,

when tolling is applied, petitioner filed his petition 355 days after the date the judgment

became final (203 + 15 + 137).  Thus, the petition is timely.

B. Exhaustion of State Court Remedies

Before addressing the merits of a habeas corpus petition, the court must

determine whether the petitioner has exhausted his state remedies.  See 28 U.S.C. §

2254(b)–(c); Picard v. Connor, 404 U.S 270, 274 (1971).  To satisfy this exhaustion

requirement, the petitioner must have fairly presented at each available level of the state courts

the same federal constitutional claims raised in his petition to the federal court.  See Picard,

404 U.S. at 275–76; Klein v. Harris, 667 F.2d 274, 282–83 (2d Cir. 1981).

Petitioner raised his first claim—that the evidence presented at trial was

insufficient to prove his guilt beyond a reasonable doubt—on direct appeal.  The Appellate

Division denied the claim on the merits, see People v. Singh, 785 N.Y.S.2d 466 (2d Dep't

2004), and the Court of Appeals denied leave to appeal.  See People v. Singh, 825 N.E.2d 143

(N.Y. 2005).  Accordingly, this claim has been exhausted.

Petitioner raised his next two claims—that his conviction should be vacated

-11-

because of newly discovered evidence and that his trial counsel was ineffective—in two separate N.Y. Crim. Proc. Law § 440.10 motions. The trial court denied both motions on the merits. (Decision and Order, dated Mar. 15, 2007; Decision and Order, dated Mar. 23, 2006.) The Appellate Division subsequently denied both of petitioner's requests for leave to appeal the trial court's decision.[12] (Decision and Order, dated June 4, 2007; Decision and Order, dated Aug. 24, 2006.). Thus, these claims are exhausted.

Finally, petitioner raised his ineffective assistance of appellate counsel claim before the Appellate Division in a motion for a writ of error *coram nobis*. The Appellate Division denied petitioner's motion and the Court of Appeals denied petitioner leave to appeal the trial court's denial. People v. Singh, 904 N.E.2d 851 (N.Y. 2009). Because this is the proper means to raise such a claim, this claim has been properly exhausted. See Mathis v. Hood, 851 F.2d 612, 614–15 (2d Cir. 1988); Figueroa v. Portuondo, 96 F. Supp. 2d 256, 276–77 (S.D.N.Y. 1999); People v. Bachert, 509 N.E.2d 318, 321 (N.Y. 1987).

C. Standard of Review

AEDPA provides the applicable standard for determining whether a petition for habeas corpus should be granted:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.

---

[12] The Appellate Division also denied petitioner's motion for reconsideration of its denial of his application for leave to appeal the motion to vacate on the grounds of newly discovered evidence. (Decision and Order, dated Sept. 17, 2007.)

28 U.S.C. § 2254(d)(1).  Petitioner bears the burden of proving his claims by a preponderance of the evidence.  Harned v. Henderson, 588 F.2d 12, 22 (2d Cir. 1978); see also Belleza v. Fisher, Nos. 01-CV-1445, 03-MISC-0066, 2003 WL 21854749, at *10 (E.D.N.Y. Aug. 6, 2003) ("Nothing in the AEDPA revisions changes this burden.").

### D. Sufficiency of the Evidence at Trial

Petitioner first argues that a rational jury could not have found either that the evidence established his guilt beyond a reasonable doubt or that he lacked justification.  The crux of petitioner's argument is that the prosecution presented witnesses who perjured themselves and were not credible as compared to petitioner's witnesses.  (See Amended Petition, dated Mar. 13, 2009, at 3; Petitioner's Reply, dated July 29, 2010 ("Pet'r Reply"), at 15–19.)

On federal habeas review of the sufficiency of the evidence to support a criminal conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319 (1979) (citing Johnson v. Louisiana, 406 U.S. 356, 362 (1972)).  "[U]pon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution."  Id. (emphasis in original).  If the court is "faced with a record of historical facts that supports conflicting inferences[, it] must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."  Id. at 326. Moreover, a presumption of correctness applies to a trial court's assessment of witness credibility.  Shabazz v. Artuz, 336 F.3d 154, 161 (2d Cir. 2003); see also Schlup v. Delo, 513 U.S. 298, 330 (1995) ("[U]nder Jackson, the assessment of the credibility of witnesses is

-13-

generally beyond the scope of review.").

In this case, the Appellate Division affirmed petitioner's judgment of conviction and specifically found that the evidence was legally sufficient to establish petitioner's guilt beyond a reasonable doubt and that the guilty verdict was not against the weight of the evidence. People v. Singh, 785 N.Y.S.2d 466 (2d Dep't 2004). The court found "no basis to disturb the jury's resolution of the credibility issue and its rejection of the justification defense" and noted that the evidence against petitioner "included testimony that the defendant drew a knife and stabbed the unarmed victim in the chest." Id. at 467.

The Appellate Division's finding that there was sufficient evidence for petitioner's conviction was neither "contrary to" nor an "unreasonable application" of Jackson and its progeny. In analyzing the claim, the court relied on People v. Contes, 454 N.E.2d 932, 932–33 (N.Y. 1983), the case in which the New York Court of Appeals adopted Jackson as the standard for review of the legal sufficiency of evidence in a criminal case. In addition, the trial record demonstrates that the Appellate Division's application of Jackson was not unreasonable, as it fully supports the findings that (a) a rational trier of fact could have found the essential elements of first-degree assault beyond a reasonable doubt; and (b) the prosecution disproved petitioner's justification claim beyond a reasonable doubt. First, the prosecution offered evidence that petitioner stabbed Patel in the chest with a sharp, curved knife, and that the stabbing resulted in severe, life-threatening injuries. See People v. Riccardi, 605 N.Y.S.2d 112 (2d Dep't 1993) (finding that the victim's wounds, which a medical expert described as "life-threatening," were sufficient to support the jury's verdict of first-degree assault). Second, the prosecution presented ample evidence that petitioner was not justified in using deadly

physical force, including Patel's testimony that he was unarmed and that petitioner and Puneet

approached him and started a verbal and physical confrontation, and Officer Durrell's testimony

that he did not observe any injuries on petitioner's person. As a result, petitioner's sufficiency of

the evidence claim is without merit.

### E. Prosecution Witnesses' Alleged Perjury

Petitioner's next claim is that his conviction should be vacated because of newly

discovered evidence that prosecution witnesses committed perjury. Specifically, he argues that

email correspondence and pictures, which he discovered after his trial, show that several

prosecution witnesses perjured themselves when they testified at trial that a group called the

"Horsemen" was a basketball team rather than a gang. Petitioner raised this claim on his second

motion to vacate pursuant to N.Y. Crim. Proc. Law § 440.10. The court denied petitioner's

motion and held that "the new items merely impeach the former evidence, defendant fails to

establish that such evidence could not have been discovered prior to trial and finally, such

evidence would not have changed the outcome of the trial." (Decision and Order, dated Mar. 15,

2007, at 5.)

Petitioner's newly-discovered-evidence claim does not state a ground for habeas

relief. A claim "based on newly discovered evidence ha[s] never been held to state a ground for

federal habeas relief absent an independent constitutional violation occurring in the underlying

state criminal proceeding." Herrera v. Collins, 506 U.S. 390, 400 (1993). With respect to the

newly-discovered-evidence claim, he did not raise any constitutional issues in his petition.

It must be noted that, in his reply brief, petitioner converts his newly-discovered-

evidence claim into a constitutional claim; he argues that his due process rights were violated by

the prosecutor's knowing use of perjured testimony.  (Pet'r Reply at 3.)  While the claim as such certainly alleges an independent constitutional violation, it is wholly distinct from the newly-discovered-evidence claim.  More important, it is unexhausted because he did not raise any due process or prosecutorial misconduct challenges in his direct appeal and procedurally barred because he cannot do so now.[13]  Thus, petitioner's claim based on prosecution witnesses' alleged perjury, whether styled as a newly-discovered-evidence or a due process claim, is without merit.

F. Ineffective Assistance of Trial Counsel

Petitioner next argues that his trial counsel were ineffective in failing to introduce evidence that would have purportedly proven that Patel and more than ten of his friends attacked petitioner.  Specifically, petitioner contends that trial counsel should have called as witnesses: (a) Puneet and other individuals who were at the nightclub, (b) a cultural or religious expert, and (c) a character witness.

To prove a claim of ineffective assistance of counsel, petitioner must demonstrate that: (1) his counsel's performance was constitutionally deficient; and (2) the deficient performance prejudiced the defense.  Strickland v. Washington, 466 U.S. 668, 687 (1984); see also Panuccio v. Kelly, 927 F.2d 106, 108 (2d Cir. 1991).  With regard to the first prong, the

---

[13] Petitioner has procedurally defaulted on this claim "because New York's procedural rules now bar him from raising it in New York courts."  St. Helen v. Senkowski, 374 F.3d 181, 183 (2d Cir. 2004).  Further direct review by the Court of Appeals is no longer available, see N.Y. Court Rules, § 500.10(a) (authorizing only one request for review of a conviction), and the failure to have raised the claim on direct review now forecloses further collateral review in state court, see N.Y. Crim. Proc. Law § 440.10(2)(c) (barring review if claim could have been raised on direct review).  "In the case of procedural default (including where an unexhausted claim no longer can proceed in state court), [a federal court] may reach the merits of the claim 'only if the defendant can first demonstrate either cause and actual prejudice, or that he is actually innocent.'"  St. Helen, 374 F.3d at 184 (citing Bousley v. United States, 523 U.S. 614, 622 (1988)).  Petitioner has made no such showing.

Supreme Court has stated that constitutionally deficient performance "requires [a] showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." Strickland, 466 U.S. at 687; see also Sepulveda v. United States, No. 95-CV-2569, 1998 WL 355182, at *2 (E.D.N.Y. June 29, 1998) ("Although the Supreme Court has not established specific guidelines for evaluating the reasonableness of counsel's actions, courts should apply a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional judgment.'" (quoting Strickland, 466 U.S. at 690)). Under the second prong, petitioner must establish that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

To obtain federal habeas relief on a claim of ineffective assistance that was previously rejected by a state court, a petitioner must do more than convince the federal habeas court that, in its independent judgment, the state court applied Strickland incorrectly. Bell v. Cone, 535 U.S. 685, 699 (2002) (citing Williams v. Taylor, 529 U.S. 362, 365 (2000)). Rather, the petitioner must show that the state court applied Strickland to the facts of his case in an objectively unreasonable manner. Williams, 529 U.S. at 365; see also Sellan v. Kuhlman, 261 F.3d 303, 315 (2d Cir. 2001). To be "objectively unreasonable," a state court's application of clearly established federal law must involve "some increment of incorrectness beyond error . . . ." Sellan, 261 F.3d at 315 (internal quotations omitted).

First, petitioner argues that Puneet should have been called as a witness, because "he could have corroborated Petitioner's testimony that Patel and his friends violently attacked them for no reason," (Pet'r Reply at 29), and had he testified, "his medical records revealing his

injury, showing the extent of the beating, could have been put forth into evidence . . . , thereby giving the defense tremendous credibility." (Id. at 29–30.) In addition, he contends that other fact witnesses "would have given a jury a different view of the facts, attacked the State's witnesses' version of the events, and corroborated the Petitioner's core basis for a self-defense premise . . . ." (Id. at 31.) Second, he argues that it was crucial for the jury to hear from an independent source that he "had a religious obligation" carry his Kirpaan. (Id.) Third, he contends that, notwithstanding the adjournment in contemplation of dismissal he had received for an "annoying phone call," trial counsel should have called one of the "numerous" character witnesses he had available to him. (Id. at 32–33.) Petitioner argues that trial counsel's decision not to call these witnesses was not strategic or, in the alternative, was an unreasonable strategy. (See id. at 34–37.)

"A petitioner cannot meet the first prong of the Strickland test merely by showing that [his or] her counsel employed a poor strategy or made a wrong decision." Cotto v. Lord, No. 99 Civ. 4874, 2001 WL 21246, at *8 (S.D.N.Y. Jan. 9, 2001), aff'd, No. 01-2056, 21 Fed. Appx. 89, 2001 WL 1412350 (2d Cir. Nov. 8, 2001). As a general matter,

> strategic choices made after thorough investigation of law and fact
> relevant to plausible options are virtually unchallengeable; and
> strategic choices made after less than complete investigation are
> reasonable precisely to the extent that reasonable professional
> judgments support the limitations on investigation. . . . In any
> ineffectiveness case, a particular decision not to investigate must
> be directly assessed for reasonableness in all the circumstances,
> applying a heavy measure of deference to counsel's judgments.

Strickland, 466 U.S. at 690–91. An attorney's decision "whether to call specific witnesses—even ones that might offer exculpatory evidence—is ordinarily not viewed as a lapse in professional representation." United States v. Best, 219 F.3d 192, 201 (2d Cir. 2000) (citing

United States v. Schmidt, 105 F.3d 82, 90 (2d Cir. 1997)); see also United States v. Smith, 198 F.3d 377, 386 (2d Cir. 1999) ("The decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial." (quoting United States v. Eisen, 974 F.2d 246, 265 (2d Cir. 1992))).

Petitioner previously raised the same ineffective assistance arguments before the trial court, and the court denied his motion on the merits, finding that petitioner's claim was without merit because trial counsel had, along with an investigator, interviewed many potential defense witnesses, had proffered the testimony of four such individuals, and had "clearly made strategic decisions regarding defendant's case." (Decision and Order, dated Mar. 23, 2006, at 4.) The court also found that petitioner had failed to demonstrate any prejudice. (Id.)

Not only is the trial court's factual finding that trial counsel made a strategic decision not to introduce the evidence entitled to a presumption of correctness, see 28 U.S.C. § 2254(e)(1); Lawrence v. Artuz, 91 F. Supp. 2d 528, 536 (E.D.N.Y. 2000), but there is ample support in the record for that finding. In fact, Kenneth J. Schreiber, Esq., one of the two attorneys who represented petitioner at trial, explained in an affidavit his and his co-counsel's reasons for not introducing the evidence,[14] and the Appellate Division accepted his averments.

---

[14] First, Schreiber interviewed Puneet but decided it would "not help [petitioner]'s case" to have him testify because

> 1) his recollection of what occurred differed somewhat from Navdeep Singh's and therefore, I believed that Puneet Singh's testimony would allow the prosecutor to attack Navdeep Singh's credibility; 2) Puneet Singh was a tall, large man in appearance and, because I anticipated interposing a justification defense, I

(continued...)

Moreover, the trial record corroborates Schreiber's purported reason for failing to call a character witness—because it would open the door to questions about petitioner's past arrest for aggravated second-degree harassment. (See Tr. at 944–50, 952–53.) In addition, as the Appellate Division highlighted, defense counsel pursued several other means of exculpating his client, and they vigorously attacked the prosecution witnesses' credibility. Applying the deferential standard for strategic decisions in ineffective assistance of counsel cases, it is clear that defense counsel's failure to call these additional witnesses was not constitutionally defective. As a result, it is unnecessary to consider the second prong of the Strickland test.

### G. Ineffective Assistance of Appellate Counsel

Finally, petitioner argues that his appellate counsel was ineffective for failing to raise the following claims on direct appeal: (1) that the trial court erroneously permitted prejudicial photographs of the victim into evidence; (2) that there was prosecutorial misconduct, based on various improper actions or statements of the prosecutors; (3) that trial counsel failed

---

[14](...continued)
> believed that Puneet Singh's physical appearance would detract from that defense; 3) I believed that Puneet Singh was not as articulate as defendant and would make a poor impression with the jury and take away from defendant's testimony.

(Affidavit of Kenneth J. Schreiber, Esq., sworn to Feb. 15, 2006 ("Schreiber Aff."), annexed as Ex. A to Respondent's Affirmation in Opposition to Defendant's Motion to Vacate Judgment, dated Feb. 15, 2006, ¶ 7.) Second, Schreiber "believed it would be better for [petitioner] to testify about the religious significant [sic] of the Kirpan [sic] and other aspects of the Sikh religion . . . since he was not charged with possession of a weapon but, rather, with using it unlawfully," and he discussed the decision with petitioner. (Id. ¶ 11.) Third, Schreiber and his co-counsel considered presenting character witnesses on petitioner's behalf but "determined that it would do more harm than good" to present such witnesses because the trial court informed them that putting on such witnesses would open the door for the prosecutor to cross-examine the witnesses on their knowledge of petitioner's prior arrest for harassment. (Id. ¶ 13.)

to prevent the introduction of petitioner's pre-Miranda inculpatory statements into evidence; (4) that the court's instructions to the jury that witnesses were not prohibited from speaking to one another was erroneous; and (5) that the court erroneously permitted inadmissible evidence and an in-court identification of petitioner into evidence at trial.

Petitioner raised the same ineffective assistance of appellate counsel arguments before the Appellate Division, Second Department, in his application for writ of error *coram nobis*. The Appellate Division denied the motion, holding that petitioner "failed to establish that he was denied the effective assistance of appellate counsel." People v. Singh, 863 N.Y.S.2d 371, 372 (2d Dep't 2008) (citing Jones v. Barnes, 463 U.S. 745 (1983); People v. Stultz, 810 N.E.2d 883 (N.Y. 2004)).

"Although the Strickland test was formulated in the context of evaluating a claim of ineffective assistance of trial counsel, the same test is used with respect to appellate counsel." Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994) (citations omitted). To establish ineffective assistance of appellate counsel, petitioner must show that "counsel's representation fell below an objective standard of reasonableness[,]" Forbes v. United States, 574 F.3d 101, 106 (2d Cir. 2009) (per curiam) (quoting Strickland, 466 U.S. at 688), and that "there was a reasonable probability that [the claims appellate counsel failed to argue] would have been successful before the state's highest court." Mayo, 13 F.3d at 534 (citations and internal punctuation omitted). Moreover, it is well settled that there is no constitutional right to have appellate counsel raise every nonfrivolous issue that the defendant requests. Jones, 463 U.S. at 754; see also Evitts v. Lucey, 469 U.S. 387, 394 (1985) ("[T]he attorney need not advance *every* argument, regardless of merit, urged by the appellant." (citations omitted).)

In this case, appellate counsel has averred not only that petitioner failed to request that he raise these issues on appeal, but that he specifically directed appellate counsel *not* to do so. Appellate counsel submitted an affirmation in conjunction with petitioner's application for a writ of *coram nobis*; in the affirmation, he stated that after he advised petitioner that the result of prevailing would be a new trial rather than dismissal, petitioner decided not to raise the claims (to spare further expense and further embarrassment to his religious community). (Affirmation of Richard E. Mischel, Esq., dated May 6, 2008 ("Mischel Aff."), ¶ 12.) Moreover, appellate counsel averred that he did not believe the arguments to be meritorious. (Id. ¶ 20.) Even to the extent that petitioner contests appellate counsel's version of events,[15] it is clear that the decision was a strategic one based on the belief that the arguments would be frivolous.

"Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible," Jones, 463 U.S. at 751, and "the decision of appellate counsel to choose among plausible options of appellate issues is preeminently a strategic choice and is 'virtually unchallengeable.'" Richburg v. Hood, 794 F. Supp. 75, 78–79 (E.D.N.Y. 1992). Whether or not petitioner directed the decision, there is no basis in the record for concluding that appellate counsel's failure to include the five claims "was anything other than a reasonable professional

---

[15] Petitioner does not contend in either his petition or his reply brief that he urged appellate counsel to make these arguments. However, in the context of his application for a writ of error *coram nobis*, he disputed appellate counsel's version of events and stated that "if appellate counsel actually thought (or believed)" that it was the strategy that petitioner wanted to pursue, "he could not have been more wrong." (Reply to the People's Opposition of Defendant's Writ of Error Coram Nobis, dated June 13, 2008, at 4 (emphasis in original).)

judgment." <u>Cantone v. Superintendent</u>, 759 F.2d 207, 219 (2d Cir. 1985). Thus, petitioner has failed to satisfy his burden under the first prong of <u>Strickland</u>, and it is unnecessary to consider whether there was reasonable probability that the claims would have been persuasive.[16]

## CONCLUSION

For the reasons set forth above, I respectfully recommend that this petition for a writ of habeas corpus be denied. Any objection to this Report and Recommendation must be filed with the Clerk of the Court, with courtesy copies to Judge Irizarry and to my chambers, within fourteen (14) days. Failure to file objections within the specified time period waives the right to appeal the district court's order. <u>See</u> 28 U.S.C. § 636(b)(1); <u>see also</u> Fed. R. Civ. P. 72, 6(a), 6(e).

Respectfully submitted,

_____/s/_____
ROBERT M. LEVY
United States Magistrate Judge

Dated: May 20, 2011
      Brooklyn, New York

---

[16] However, it bears noting that all five claims that petitioner highlights suffer from serious deficiencies, such as problems with preservation. (<u>See</u> Respondent's Memorandum of Law, dated June 30, 2009, at 41–47; Mischel Aff. ¶¶ 14–19.)